# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TULLY CONSTRUCTION CO., INC.**<br>127-50 Northern Blvd<br>Flushing, NY 11368<br><br>*Plaintiff*,<br><br>v.<br><br>**NATIONAL RAILROAD PASSENGER CORP.**<br>1 Massachusetts Ave NW<br>Washington, DC 20001<br>Serve:  CT Corporation System<br>          1015 15th Street NW<br>          Suite 1000<br>          Washington, DC 20005,<br><br>*Defendant.* | Civil No.: 1:24-cv-01813 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Tully Construction Co., Inc. ("Tully") hereby submits this Complaint for Declaratory and Injunctive Relief against Defendant National Railroad Passenger Corporation ("Amtrak"). In support thereof, Tully states as follows:

### Parties

1. Tully is a New York corporation with its principal place of business in Flushing, NY.

2. Amtrak is a mixed-ownership government corporation providing passenger railroad services. For purposes of this Court's jurisdiction, Amtrak is a citizen only of the District of Columbia. Its principal place of business is in the District of Columbia.

1

**Jurisdiction and Venue**

3. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that the amount in controversy exceeds $75,000, exclusive of costs, and is wholly between citizens of different states.

4. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that this case arises under the laws of the United States.

5. Venue is proper in this Court pursuant to 28 U S.C. § 1391(b)(1) and (3) because Amtrak is subject to personal jurisdiction in the District of Columbia as set forth in 49 U.S.C. §24301(b). Further, Amtrak has its principal place of business in the District of Columbia.

**Statement of Facts**

**The Request for Quotations and Request for Proposals**

6. On April 3, 2023, Amtrak issued RFQ No. X036-23094 ("RFQ"), soliciting Statements of Qualifications from parties interested in performing construction services for the East River Tunnel Rehabilitation Project ("Project"). A copy of the RFQ is attached hereto as **Exhibit A**. The RFQ described the work required by the Project:

> The East River Tunnel ("ERT") consists of four tubes that connect Manhattan to Long Island and are used for Amtrak, Metropolitan Transportation Authority ("MTA") Long Island Rail Road ("LIRR") services, and New Jersey Transit ("NJ TRANSIT").
>
> The ERT tubes, constructed in 1909, require significant rehabilitation and improvement, due to continually worsening conditions of the tunnel structure given both its age and damage related to Superstorm Sandy, to ensure continuation of operations for LIRR, NJ TRANSIT, and Amtrak. The tunnel renovations will also be designed to improve the safety and security (to the greatest extent practicable) in the tunnels.
>
> This Project will rehabilitate two tubes of the East River Tunnel (Line 2 and Line 1) from portal to portal - Penn Station to

>Sunnyside Yard including utility extensions and connections in Penn Station and Sunnyside Yard. The Project will ensure continuation of operations for LIRR, NJ TRANSIT, and Amtrak, and improve the safety and security of the East River Tunnel.

Ex. A at 5.

7. Amtrak was to evaluate the Statements of Qualifications and invite each of the most qualified proposers to submit a proposal in response to the Request for Proposals No. X036-230205 ("RFP"). A copy of the RFP is attached hereto as **Exhibit B**.

8. The RFP stated that changes to the scope of work would be made by amending the RFP, including statements that "[a]ny changes or modifications that Amtrak agrees to make will be communicated by Amtrak to all Offerors in the form of an Amendment to this Solicitation"; and "[a]ny such revisions will be implemented through issuance of Amendments to the RFP." Ex. B at 2, 6.

9. The RFQ explained that the Project is eligible to be financed by federal funds administered by the Federal Railroad Administration, among others. Ex. A at 9; Ex. B at 3.

10. Tully timely submitted a Statement of Qualifications, and Amtrak invited Tully to submit a proposal in response to the Request for Proposals.

11. Tully timely submitted a proposal in response to the RFP on December 13, 2023.

12. Tully's proposal consisted of two volumes – the technical proposal and the price proposal. After evaluating all proposals for responsiveness, Amtrak was to then conduct a "qualitative evaluation of the Technical Proposal, and … evaluation of the Price Proposal." Ex. B at 17.

13. Amtrak stated that it would evaluate the two volumes using the following criteria in descending order of importance: Project Understanding and Approach; Project Schedule; Project Management and Execution Plan; and Pricing. Ex. B at 17-18.

14.     Award was to be made to the offeror with "the best value proposal, taking into consideration the evaluation criteria and procedures set forth in Section 20 [set forth above]." Ex. B at 18.

15.     The RFP was otherwise silent on the relative importance of the four factors. During the post-award debriefing, Amtrak disclosed that the technical score was weighted 60% and the price proposal was weighted 40% but did not offer any proof of whether those percentages were applied to proposals.

16.     Each offeror was required to disclose in its submission any known conflicts of interest. Ex. B at 9. Tully did not have any conflicts of interest.

## Interviews and Discussions

17.     After proposals were submitted, Amtrak, by and through its Senior Procurement Manager Jerard Linnemann invited each offeror to an interview. The interview was "part of the evaluation process" and consisted "of a presentation by the Offeror followed by a question-and-answer discussion session." Ex. B at 14.

18.     Amtrak cautioned offerors that the interview and presentation were not to be "used to fill in missing or incomplete information that was required in the Proposal." Ex. B at 14.

19.     Tully's interview took place on January 12, 2024. Tully was complimented on its comprehensive response addressing each of the items of the RFP and for presenting a well-planned technical approach along with a thorough discussion of the top five potential risks. The interview committee expressed their appreciation of Tully's discussion on the commissioning phase and the linear schedule that it provided. The evaluators felt that Tully went into immense detail on the work sequence and addressing potential risk with mitigations.

20. After the interviews, Tully learned that, in February 2024, Amtrak had hired Mr. Youssef Dehne, a recent employee of Skanska USA – the other offeror on this procurement within the competitive range – as Amtrak's Senior Project Director, CAPD Infrastructure Project Delivery Tunnels & Systems.

21. During his time at Skanska, Mr. Dehne worked on projects similar to the Project at issue here, including at least one other mass transit rail project.

22. Despite Mr. Dehne's obvious connections to an actual offeror, Amtrak allowed the former Skanska employee to lead negotiation meetings with the only two offerors in competitive range, Tully and Skanska; all the while accompanied by several Amtrak technical evaluators. The Amtrak technical evaluators present at one or more meetings led by Mr. Dehne included Amtrak Project Manager Irene Kravets, Mike Cooley, and Ken Walther.

23. After the initial interview contemplated by the RFP, Amtrak issued a set of questions to be answered by the offerors and requested a best and final offer ("BAFO") from the two offerors in the competitive range, Tully and Skanska.

24. Tully timely provided responses to Amtrak's questions as well as its first BAFO on February 20, 2024.

25. After Tully submitted its first BAFO, Amtrak scheduled a series of virtual (Microsoft Teams) discussion meetings with Tully. Although Amtrak later maintained that the technical evaluations had been completed by this time, during these discussion meetings in March and April 2024, Amtrak expressed that they were still looking at the proposals and continued to raise issues related to scheduling and changes to the work, as well as pricing. Amtrak technical evaluators regularly attended these meetings scheduled by Jerard Linnemann and led by Youssef Dehne.

26. Amtrak scheduled a Microsoft Teams meeting with Tully on March 8, 2024, to discuss Tully's first BAFO. Mr. Dehne led the March 8, 2024, meeting. During the meeting, Amtrak issued additional questions, requested revised pricing, and added to the scope of work. Tully would be required to revise its price to account for the added work.

27. Mr. Dehne sought detailed explanations of Tully's pricing, including breakdowns of specific cost elements. He was accompanied at the meeting by Mr. Linnemann and Mr. Cooley, one of the technical evaluators whose work had supposedly been completed by January 30, 2024.

28. Despite the plain language of the RFP requiring changes to the requirements to be made by amendment of the RFP, Amtrak did not amend the RFP to include the changed scope of work.

29. On March 19, 2024, Amtrak asked that Tully revise its pricing yet again and also provide a flood mitigation plan, to include designing and installing flood mitigation measures, which would increase Tully's price. Amtrak later retracted the requirement to provide the flood mitigation plan but continued to pressure Tully to further reduce its pricing.

30. Tully complied and submitted a second BAFO on March 22, 2024.

31. On March 27, 2024, Amtrak scheduled another Microsoft Teams meeting to discuss the project schedule and to inquire about Tully's plan to manage the expected outages in service due to the work in the tunnels, as well as Tully's management of any potential delay related to the start of work on the project. Mr. Dehne again led the meeting, and opened by acknowledging that Amtrak's delay in evaluating proposals would cause a reduction in the mobilization period at contract start-up. As before, Mr. Cooley and Mr. Linnemann also attended the meeting.

32. On April 2, 2024, in response to Tully's second BAFO, Amtrak scheduled another meeting for the following day. The April 3, 2024, meeting was attended by Mr. Dehne, Mr. Linnemann, Jacobs lead Design Engineer Nick Chen, Mike Cooley, and Ken Walther along with Tully representatives Peter Tully (President & CEO) and Peter Mazza P.E. (Chief Engineer). As had become standard by that time, Mr. Dehne led the meeting.

33. At the April 3, 2024, meeting, Amtrak introduced numerous additional scope changes, none of which were identified in the RFP, including 1) the use of spare ducts to install new Fiber Cable at 1st Avenue for Long Island Railroad ("LIRR") control cabinets; 2) installation of fiber optic cable at Penn Station subbasement routed to the LIRR communications room at the eastern end of Platform 10; 3) work added by Jacobs Engineering that modified the overhead catenary system supports; 4) Amtrak's suggestion to purchase the components for the emergency pathfinding system from the sole provider, Marimils of Finland, and assemble the components in the United States, in order to comply with Buy American Act provisions, which would increase Tully's cost; and 5) Amtrak's suggestion to purchase the components for the linear heat detection system from a foreign manufacturer and assemble the components in the United States, in order comply with the Buy American Act provisions, which would increase Tully's cost. These additional work items, fully integrated into the Project schedule by Tully engineers, carried an increased price of $1,619,250 for items 1-3 as well as a potential price increase of $4,500,000 associated with items 3 and 4.

34. Again, Amtrak did not amend the RFP to include this new work, even though it required Tully to revise its pricing to account for the new tasks.

35. Despite the increase in work, Amtrak yet again sought further price reductions.

36. Mr. Dehne acknowledged the delay in Amtrak's evaluation of proposals and acknowledged that Amtrak would continue to review the submitted proposals. Mr. Dehne also acknowledged that the new requirements were changes to the RFP's scope of work.

37. Nevertheless, Amtrak did not amend the RFP to include this new work, even though it required Tully to revise its pricing to account for the new tasks.

38. Tully submitted its third BAFO on April 3, 2024, addressing all the additional scope changes described in ¶ 33 above. Those changes included new price increases required by the updated drawings prepared by Jacobs Engineering that were not included in the RFP, as well as the revised LIRR fiber optic requirements plus the Buy American Act suggestions.

39. Tully also followed Mr. Dehne's direction to incorporate all changes discussed prior to April 3, 2024, into the detailed critical path method schedule included with Tully's third BAFO. Mr. Dehne also stated that he wanted any and all revisions to the original RFP incorporated into the final schedule and bid pricing, and Tully complied.

40. At this final juncture it was made clear by Mr. Dehne and those selection committee staff members who attended the April 3, 2024, meeting (Mr. Cooley and Mr. Walther) that the procurement process was far from over and that the selection of the best value proposal was not concluded, contrary to the position now taken by Amtrak that the technical evaluation had been completed three months earlier on January 30, 2023. Amtrak's assertion that its technical review was completed by January 30, 2024, is a factually unsupportable post hoc assertion made in an effort to avoid responsibility for its significant errors, including Amtrak's violations of the RFP's evaluation criteria, Amtrak's procurement regulations, and its ethical guidelines issued by Amtrak's Office of Inspector General.

**Award to Skanska and Debriefing**

41.     On April 9, 2024, Amtrak disclosed that Skanska was selected as the awardee. Explaining that Amtrak had only recently completed its evaluation of proposals, Mr. Linnemann emailed Tully, "We've concluded our review and evaluation and the decision was made to award the project to another company." Tully requested a debriefing from Amtrak.

42.     Nearly six weeks after Tully's request, Amtrak conducted Tully's debriefing on May 21, 2024.

43.     During the debriefing, Amtrak lauded Tully's technical proposal, noting its excellent schedule narrative, presentation, project management, and execution plan, including safety plan, and executive summary.

44.     Amtrak described the difference between the two most competitive proposals (Tully and Skanska) as "razor thin."

45.     Further, Amtrak revealed Tully to be the lowest bidder.

46.     However, Amtrak refused to disclose Tully's overall score, or how that score compared with the scores of other offerors, including Skanska, despite Tully's repeated requests.

47.     Tully questioned Amtrak's use of a former Skanska employee to lead discussions with and evaluate the proposals from Skanska and Tully, noting the required conflict of interest disclosure.

48.     Amtrak stated that technical evaluations were already complete at the time the former Skanska employee led discussions with offerors, despite the numerous changes in scope during those discussions.

49. Amtrak noted in the debriefing that Tully's overall score had not changed from its first BAFO to its third BAFO – despite a price reduction of approximately $29 million during that time, as well as an increased scope of work.

50. During the debriefing Tully informed Amtrak that Skanska has contacted several of Tully's proposed subcontractors – whose experience Amtrak praised – seeking advice on how to perform the work required by the contract. In particular, Skanska contacted Tully's plumbing subcontractor and made clear that Skanska did not understand the basic requirements of the project. Tully's concern elicited no response from Amtrak.

51. Scores for the pricing proposal – and therefore final scores – could not have been complete when Mr. Dehne took control of the procurement in February 2024. Mr. Dehne acknowledged in meetings with Tully that Amtrak continued to review proposals related to schedule, changed work, and price under his supervision, up until days before the award to Skanska.

52. On May 30, 2024, Tully filed a protest with Amtrak on the same bases as those set forth in this Complaint.

53. On June 13, 2024, Amtrak responded to Tully's protest.

54. In Amtrak's response, Amtrak claimed that it "finalized evaluations of each proposer's technical proposal on January 30, 2024," despite the fact that scope additions and revisions were requested as late as March and April of 2024. Amtrak conceded that it did not evaluate any of the scope of work changed after January 30, 2024, or its impact on schedule and price.

55. Amtrak further stated that Mr. Dehne, the former Skanska employee, did not "participate in the evaluation of technical or price proposals in connection with the

procurement," despite Mr. Dehne acting as Amtrak's lead in the discussions and negotiations regarding price and multiple changes in scope.

56. In its response, Amtrak alleged for the first time, and contrary to what it told Tully during the debriefing, that "[t]he difference between [Tully's and Skanska's] BAFOs was considerable … ." Amtrak did not provide any evidence of the alleged considerable difference.

57. Amtrak also alleged for the first time that "the materially unbalanced pricing offered by Tully posed an unacceptable risk to Amtrak." Amtrak did not explain how it came to this conclusion, nor why Amtrak had not alerted Tully of a concern with unbalanced pricing during any of the numerous discussions or meetings, or during the debriefing. Until Tully challenged the award to Skanska, Amtrak never mentioned a concern with unbalanced pricing, including in Tully's debriefing.

## Count I
### (Breach of Implied Contract)

58. Tully repeats and realleges paragraphs 1 through 57 as if set forth fully herein.

59. In this procurement, as a procurement using government funds, there exists an implied agreement between Amtrak and all offerors, including Tully, that Amtrak would fairly consider all proposals.

60. Further, every contract, express or implied, contains an implied obligation of good faith and fair dealing.

61. Amtrak breached both the implied contract to fairly consider Tully's proposal and the implied duty of good faith and fair dealing by:

    a. Failing to fairly consider all proposals,

    b. Failing to eliminate or mitigate a clear conflict of interest, and

    c. Failing to evaluate proposals on the basis of the actual scope of work as awarded.

62. But for Amtrak's breaches of contract, Amtrak would have found Tully's proposal to offer the best value to Amtrak, and Tully would have been awarded the contract that is the subject of this procurement.

## Count II
### (Violation of Procurement Regulations)

63. Tully repeats and realleges paragraphs 1 through 57 as if set forth fully herein.

64. As stated in the RFQ, the Project is financed by federal funds administered by the Federal Railroad Administration, among others. Ex. A at 9; Ex. B at 3.

65. The procurement for the Project therefore must conform to the requirements of federal procurement regulations, including but not limited to 2 C.F.R. § 200.318(c)(1), which states that "[n]o employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a Federal award if he or she has a real or apparent conflict of interest."

66. Amtrak violated this regulation by allowing a former employee of an offeror in the subject procurement to participate in the evaluation of proposals and the award of the contract, which created a real or apparent conflict of interest.

67. Amtrak was required to report any conflict of interest in a procurement to the federal agency that awarded funds for the procurement. 2 C.F.R. § 200.112.

68. Amtrak violated this regulation by failing to report the conflict of interest to the federal agency or agencies that awarded funds for this procurement.

69. The procurement regulations applicable to Amtrak state that a procurement process is unduly restrictive of competition, and therefore forbidden, if it includes "[a]ny arbitrary action in the procurement process." 2 C.F.R. § 200.319(b)(7).

70. Amtrak's failure to identify, mitigate, and report the conflict of interest created by Mr. Dehne's participation in the negotiation and evaluation process that led to an award to Skanska further violated ethical guidelines warning about the risk of conflicts of interest in procurements published by Amtrak's Office of Inspector General.[1]

71. Amtrak's failure to identify, mitigate, and report the conflict of interest created by Mr. Dehne's participation in the negotiation and evaluation process that led to an award to Skanska was patently arbitrary.

72. But for Amtrak's violations of applicable regulations, Amtrak would have found Tully's proposal to offer the best value to Amtrak, and Tully would have been awarded the contract that is the subject of this procurement.

## Count III
**(Injunctive Relief)**

73. Tully repeats and realleges all preceding paragraphs of this Complaint.

74. Without preliminary injunctive relief, the performance of the wrongfully awarded contract will have already begun by the time this matter is resolved by this Court, and Tully will lose the opportunity to be fairly considered for a contract funded from the public fisc. Tully will also be denied the opportunity to perform a contract awarded pursuant to the RFP. Tully will also lose key employees. Tully specializes in tunnel construction, and the union halls that provide tunnel workers for Tully's projects have only a limited number of qualified workers. Tully will lose those workers to other employers and is unlikely to be able to rehire them in the near future, leaving Tully shorthanded.

---

[1] *See* https://amtrakoig.gov/sites/default/files/reports/OIG-SP-2023-007 Fraud Risk Paper.pdf.

75. The integrity of the procurement process, which involves federal funds, will also suffer immediate, irreparable harm unless Amtrak is enjoined from proceeding with the unlawful award and performance of the contract.

76. Amtrak will suffer no irreparable harm as a result of a preliminary injunction. Amtrak is not entitled to proceed with an illegal contract award. Requiring Amtrak to comply with its procurement regulations is not a cognizable injury.

77. Amtrak's unmitigated conflict of interest, as well as its failure to evaluate proposals fairly and in accordance with the terms of the RFP, will do permanent damage to the integrity of Amtrak's spending on this Project. The public interest would not be harmed, but rather would be protected, by the requested injunctive relief as the award of the East River Tunnel Project to Tully would provide taxpayers savings in excess of several million dollars and buttress the public's confidence in federal railroad competitive bidding and related procurement regulations. An injunction will serve the public policy mandate that the public is entitled to the awarding of federally-funded contracts in a manner that protects the public from favoritism and secures fair competition

WHEREFORE, Tully prays that this Court enter the following judgment:

1. **DECLARE** that Amtrak breached the implied contract to fairly consider Tully's proposal in response to the RFP;

2. **DECLARE** that Amtrak breached is implied duty of good faith and fair dealing to fairly consider Tully's proposal in response to the RFP;

3. **DECLARE** that Amtrak violated procurement regulations, specifically 2 C.F.R. § 200.112 and 2 C.F.R. § 200.319(b)(7), as well as its own ethical guidelines, by

failing to identify, mitigate, and report the conflict of interest detailed in this Complaint;

4. **DECLARE** Amtrak's award to Skanska to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law;

5. **ENJOIN** Amtrak and Skanska from continuing performance under the contract;

6. **DIRECT** Amtrak to award the contract to Tully;

7. **GRANT** a temporary restraining order ("TRO") and preliminary injunction providing Tully with injunctive relief preventing performance of the contract by Skanska pending final judgment on the merits of this Complaint. A motion for a TRO, a motion for a preliminary injunction, and supporting memoranda are filed contemporaneously with this Complaint;

8. **AWARD** Tully its attorneys' fees and costs in pursuing this action; and

9. **GRANT** such other relief as the Court deems appropriate.

Date: June 24, 2024                              SMITH, CURRIE & HANCOCK LLP

_____
Jacob W. Scott (Bar No. 994416)
Allison G. Geewax (Bar No. 1014861)
1921 Gallows Road, Suite 850
Tysons, VA 22182
Telephone: (703) 506-1990
Facsimile: (703) 506-1140
Email: jwscott@smithcurrie.com
Email: aggeewax@smithcurrie.com
*Counsel for Tully Construction Co.*

15

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on June 24, 2024, a copy of the foregoing Complaint for Declaratory and Injunctive Relief and attached exhibits were served on defendant National Railroad Passenger Corporation in the manner described in the Rule 65.1 Certification and Certificate of Service contained in the Motion for Temporary Restraining Order filed concurrently with this Complaint.

                                                              Jacob W. Scott (Bar No. 994416)